# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

JEREMY WHITE,

    Plaintiff,

v.                                    CASE NO.: 4:19-cv-206-RH-CAS

THE FLORIDA DEPARTMENT OF
CORRECTIONS, an agency of the
State of Florida, CENTURION OF
FLORIDA, LLC, a Florida Limited
Liability Company, and ANGEL
CORTES, an individual,

    Defendants.

_____/

## FIRST AMENDED COMPLAINT

The Plaintiff, Jeremy White ("White"), by and through the undersigned

counsel, hereby sues the Florida Department of Corrections ("FDC"), Centurion of

Florida, LLC ("Centurion"), and Angel Cortes ("Cortes"), and alleges as follows:

## INTRODUCTION

1.    This is a civil rights action brought by Plaintiff White seeking monetary

damages for the Defendants' violations of Plaintiff's rights secured by the Civil

Rights Act of 1871, 42 U.S.C. § 1983, the Eighth Amendment to the United States

Constitution, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et*

*seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The Defendants

violated Plaintiff's rights by denying him the treatment that was required and necessary to cure Plaintiff's infection with Hepatitis C Virus (HCV), which constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment and discrimination on the basis of disability in violation of the Americans with Disabilities Act and the Rehabilitation Act.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3.      Jurisdiction and venue are proper in the Northern District of Florida (Tallahassee Division) in that the FDC is headquartered with its principle place of business in Leon County, Florida, and the alleged acts of misconduct giving rise to this cause of action occurred within the Northern District of Florida.

4.      The claims alleged herein are brought within the applicable statute of limitations.

5.      Plaintiff has complied with all conditions precedent and has properly exhausted all administrative remedies prior to filing this action. Specifically, Plaintiff complied with the applicable grievance process in that he: (a) filed an informal grievance in January 2019 concerning the ongoing refusal and denial of HCV treatment and requested such treatment; (b) timely filed a formal grievance to

the warden's office at Liberty Correctional Institution ("Liberty CI"); and, lastly, (c) submitted a timely appeal to the Office of the Secretary of FDC. Unsurprisingly, Plaintiff was denied the relief he requested and, ultimately, the treatment that he was constitutionally-entitled to receive. Alternatively, Plaintiff alleges that the exhaustion requirement does not apply as this action was commenced after Plaintiff was released from prison.

## THE PARTIES

### Jeremy White

6.      Plaintiff White brings this action for violation of the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiff White was an inmate incarcerated in the State of Florida from May 5, 2017, to April 28, 2019. Throughout his incarceration, Plaintiff has been housed at multiple facilities that are owned and operated by Defendant FDC, including Baker Correctional Institution ("Baker CI"), Central Florida Reception Center ("CFRC"), Lawtey Correctional Institution ("Lawtey CI"), and Liberty CI. Plaintiff was denied treatment for his HCV at every correctional facility he was housed.

### The Florida Department of Corrections

7.      Defendant FDC is an agency of the State of Florida that owns and operates correctional facilities in the state, and which receives federal funds to operate its agency. Defendant FDC is headquartered in Leon County, Florida, and

therefore venue is proper in Tallahassee, Florida. Defendant FDC is responsible for overseeing the operations of its contractors, including Defendant Centurion. At all times relevant hereto, Defendant FDC owned and operated all of the facilities where Plaintiff was housed and denied treatment for his HCV, including Liberty CI.

## Centurion of Florida, LLC

8.     Defendant Centurion is a Florida-based company and provider of correctional healthcare. Defendant Centurion has provided healthcare services to Florida inmates since approximately February 2016. At all relevant times hereto, Defendant Centurion provided healthcare services at all of the facilities where Plaintiff was housed and denied treatment for his HCV, including Liberty CI.

## Angel Cortes

9.     Defendant Cortes is a licensed Area of Critical Need Medical Doctor who worked at Liberty CI all times relevant hereto. Further, Defendant Cortes was, at all relevant times, the Medical Director of Liberty CI. Defendant Cortes refused to treat Plaintiff's HCV despite being aware of Plaintiff's serious medical need and chronic condition. Defendant Cortes's deliberate indifference to Plaintiff's chronic HCV—a serious medical need—caused Plaintiff to suffer substantial injuries, including but not limited to permanent liver damage.

10.     At all times relevant hereto, Defendant Cortes acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Cortes is sued in his individual capacity.

## FACTS

### Background Information on Hepatitis C Virus

11.     Hepatitis C is a blood borne disease caused by the Hepatitis C Virus ("HCV"). The virus causes inflammation that damages liver cells and is a leading cause of liver disease and liver transplants.

12.     HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty (50) to eighty (80) percent of infected people will develop chronic HCV.

13.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

14.     People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform the

job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

15.     When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

16.     Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

17.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

18.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

19.     Chronic HCV is, as a matter of law, a serious medical need.

### General Prevalence of HCV

20.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

21.     In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

22.     In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

23.     Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

24.     HCV is the leading indication for liver transplants in the United States.

### HCV in Prison

25.     The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States' jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

26.     Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of late-2017, it was estimated that at least 7,000 inmates are infected with HCV.

27.     In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Standard of Care for HCV

28.     For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

29.     In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs,

which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

30.     As of late-2013, DAA drugs became available for HCV patients.

31.     These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

32.     Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

33.     For HCV, a "cure" is defined as a sustained virologic response ("SVR")—i.e., no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

34.     In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the

HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.

35.     The HCV Guidance set forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

36.     In 2014, the AASLD/IDSA panel, through the HCV Guidance, recommended treatment with DAA drugs for all persons with chronic HCV. Since 2014, this has been the standard of care for the treatment of HCV, and it reflects the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

37.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

38.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

39.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

## Public Health Benefits of Treatment in Prison

40.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

41.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

42.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

## Delay and Denial of HCV Treatment to Plaintiff White

43.     From late-2013, when DAAs first became available, until approximately October of 2017, Defendant FDC and its medical contractors,

11

including Defendant Centurion, had a policy, practice, and custom of not providing DAA drugs to inmates with HCV.

44.   At all times relevant hereto, Defendant FDC enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant FDC has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

45.   Defendant Centurion became FDC's contracted healthcare services provider in February of 2016. At all relevant times thereafter, Defendant Centurion has utilized the same policy, practice, and custom of not providing DAA drugs to inmates with HCV as Defendant FDC.

46.   At all times relevant hereto, Defendant Centurion enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Centurion has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

47.   From late-2013, when DAAs first became available, until approximately October of 2017, Defendants FDC and its medical contractors,

12

including Defendant Centurion, failed and/or refused to provide DAA drugs to thousands of inmates with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of inmates with chronic HCV in Florida.

48.    As a result of Defendant FDC and its medical contractors' (including Defendant Centurion) refusal to provide DAA drugs to inmates, over 100 inmates died of untreated HCV and hundreds more suffered irreparable liver damages.

49.    Defendant FDC and Defendant Centurion also unjustifiably delayed providing HCV treatment to inmates, even though the standard of care requires treatment as early as possible. If DAA treatment is delayed until a patient has advanced fibrosis or cirrhosis, these medications can be significantly less effective. Moreover, if DAA treatment is delayed until a patient develops decompensated cirrhosis, a liver transplant preceded or followed by DAA treatment is the only way to cure the patient.

50.    At all times relevant hereto, Defendant FDC categorically withheld treatment from FDC inmates with HCV but did not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

51.     Defendant FDC and Defendant Centurion refused to provide FDC inmates, including the Plaintiff, with the necessary (and only) treatment for his HCV because of the cost of the treatment.

52.     Plaintiff was incarcerated in the Florida prison system from May 2017 to April 2019. During his initial health screening, Plaintiff informed FDC staff that he had HCV. Moreover, it is noted multiple times in Plaintiff's FDC medical file that he had a history of HCV since 2000, and as early as 1999. Upon receipt, a hepatitis panel was ordered, and Plaintiff was re-diagnosed with chronic HCV and referred to the Chronic Illness Clinic for consultation.

53.     Plaintiff had been suffering from HCV for more than seventeen (17) years by the time his incarceration began in 2017. Plaintiff requested treatment for HCV then, and was told that did not meet FDC's guidelines for treatment.

54.     Throughout his incarceration, Plaintiff regularly inquired about the condition of his liver and requested HCV treatment, but was consistently denied such treatment. Moreover, Plaintiff was not adequately informed of the severity of his liver disease and the substantial health risks associated with chronic HCV.

55.     From May 2017 until his release in April of 2019, Plaintiff was only given routine blood draws to monitor his HCV. Plaintiff was not provided DAAs even though the standard of care required FDC and Centurion to provide him DAAs.

56.   Moreover, DAAs were available to the Defendants upon request. However, the Defendants did not request DAAs for, or provide DAAs to, Plaintiff.

57.   Whether an FDC inmate received treatment with DAAs almost exclusively relies on the inmate's Metavir or fibrosis score (F0-F4). Nonetheless, the Defendants failed to perform the necessary tests that would have indicated the stage and progression of Plaintiff's HCV and whether he met the requirements for treatment under FDC's guidelines.

58.   It was not until February of 2018, nearly a year after Plaintiff was re-diagnosed with chronic HCV, that Plaintiff was given a FibroSure test, which indicated that he had a fibrosis score of F2.

59.   When Plaintiff realized he was an F2 with significant fibrosis, he again demanded that he receive treatment. However, Defendants failed and/or refused to provide Plaintiff with treatment, contrary to the prevailing standard of care.

60.   For several months the Defendants, including Defendant Cortez, led Plaintiff to believe that he was going to be treated.

61.   Approximately eight (8) months before Plaintiff was due to be released, he was informed that he was not eligible for HCV treatment because of his release date.

62.   Prior to approximately August 2018, the Defendants, including Defendant Cortez, led Plaintiff to believe that he was going to receive treatment.

However, the Defendants had no intention of treating Plaintiff. Instead, the Defendants delayed treatment until they were able to deem Plaintiff ineligible due to his release date.

63.   Plaintiff was denied HCV treatment for non-medical reasons. Such denial amounted to deliberate indifference to Plaintiff's chronic HCV—a serious medical need.

64.   Despite being deemed ineligible for treatment, Plaintiff continued to request treatment. In December 2018, Plaintiff was forced to sign a refusal of treatment. He was threatened with confinement if he refused to sign the refusal of treatment form. Defendants used this involuntary refusal of treatment, as well as Plaintiff's end-of-sentence date, as an additional basis for denying him treatment that was constitutionally required—both of which are non-medical reasons for excluding Plaintiff from receiving treatment.

65.   Plaintiff had chronic HCV during his incarceration. Despite knowing that Plaintiff had chronic HCV and test results that entitled him to receive treatment, the Defendants have been deliberately indifferent to Plaintiff's serious medical needs by denying him DAA treatment, which was the standard of care and the required HCV treatment under the Eighth Amendment and the ADA and RA.

66.   Throughout his entire incarceration, Plaintiff repeatedly requested HCV treatment, both verbally and through the grievance process. However, Plaintiff

was repeatedly told that he did not qualify for treatment, that his liver was fine, and that treatment was "not clinically indicated." Instead, the Defendants' merely continued to monitor Plaintiff's chronic condition without providing him with the necessary treatment to cure his HCV.

67.    While incarcerated, Plaintiff filed numerous inmate requests, grievances, and grievance appeals, in which he complained of his symptoms and requested HCV treatment. All of Plaintiff's requests, grievances, and appeals were denied.

68.    Plaintiff has repeatedly requested an accommodation for his HCV— that is, treatment which could result in a cure for his disability. This request for DAA treatment was a request for a reasonable accommodation in that DAAs were and are the only medication that could result in a cure for his disability. That is, DAAs were and are the only drug that is capable of clearing HCV from Plaintiff's body. However, the Defendants denied providing Plaintiff with such treatment. Such delay and denial constituted deliberate indifference because the denial of the HCV treatment was due, in part, to the cost of the medicine.

69.    Plaintiff's request for DAA treatment for HCV was a reasonable request and a reasonable accommodation as the Defendants were constitutionally required to provide such medicine and treatment. DAAs were the necessary treatment under the prevailing standard of care for treating individuals with HCV.

Failing to provide the DAAs resulted in Plaintiff's denial to meaningful access to prison programs, services, and activities. Additionally, providing Plaintiff with no treatment or inadequate treatment prevented Plaintiff from accessing other services within the prison, including the prison yard and participation in recreational activities at the prison.

70.     Despite Plaintiff's numerous requests for accommodations and treatment, and despite being entitled to treatment, the Defendants refused to provide Plaintiff with DAA treatment during his incarceration.

71.     By the time Plaintiff was released from prison in April 2019, it was clear he was an F2 and had developed significant fibrosis of the liver. Defendants should have treated Plaintiff but chose not to because of the cost of the medication, along with other non-medical reasons.

72.     Plaintiff has suffered from a variety of symptoms associated with chronic HCV, including but not limited to surface bleeding, dry and itchy skin, nausea, confusion, increase weakness, abdominal pain, and joint pain.

73.     Plaintiff also suffered from extreme fatigue caused by his untreated HCV. Some days he was unable to get out of bed. As his condition worsened, Plaintiff's legs and ankles began to swell significantly, which was very painful.

74.     Plaintiff chronic HCV prevented him from working while in prison.

75.     Moreover, Plaintiff has suffered serious, substantial, and permanent injuries, including irreparable damage to his liver, as a result of the Defendants' refusal to provide adequate medical care and treatment.

76.     The irreparable damage suffered by Plaintiff may have been prevented if not for the Defendants' unconstitutional delay and denial of treatment. Plaintiff continues to suffer damages as a result of the Defendants' deliberate indifference to his serious medical need (HCV).

**COUNT I**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**(Against Defendant Cortes)**

77.     Plaintiff incorporates and re-alleges Paragraphs 1 through 76 as if fully set forth herein.

78.     This count is brought through 42 U.S.C. § 1983 and against Defendant Cortes for violation of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

79.     At all times relevant hereto, Defendant Cortes acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Cortes is sued in his individual capacity.

80.     Plaintiff had a serious medical need as he was diagnosed with chronic HCV. Defendant Cortes was subjectively aware that Plaintiff had chronic HCV and suffered from symptoms associated with chronic HCV. Plaintiff's condition and

serious medical need was so obvious that even a layperson would easily recognize the necessity for medical attention and treatment.

81.    Despite knowing that Plaintiff qualified for and should receive DAA treatment, Defendant Cortes refused to provide Plaintiff with DAAs, the only treatment and cure for HCV under the prevailing standard of care.

82.    Defendant Cortes intentionally refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

83.    Defendant Cortes has caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

84.    Defendant Cortes' refusal to provide treatment worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendant Cortes knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Thus, Defendant Cortes has been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

85.     By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendant Cortes imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

86.     Defendant Cortes's denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

87.     Defendant Cortes's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

88.     Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment. In fact, there was no medical reason for Defendant Cortes' decision not to treat Plaintiff's HCV.

89.     Plaintiff suffered damages as a direct and proximate result of Defendant Cortes' constitutional violation, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Jeremy White, demands judgment against Defendant Cortes for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT II
## 42 U.S.C. § 1983 – EIGHTH AMENDMENT *MONELL* CLAIM
## (Against Defendant Centurion)

90.     Plaintiff incorporates and re-alleges Paragraphs 1 through 76 as if fully set forth herein.

91.     This count is brought through 42 U.S.C. § 1983 and against Defendant Centurion for violation of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

92.     At all times relevant hereto, Defendant Centurion and its policymakers knew about and enforced policies, practices, and/or custom that exhibited deliberated indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Defendant Centurion, acting through its employees and agents, intentionally delayed, failed, and refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

93.     Defendant Centurion has caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

94.     The refusal to provide treatment by Defendant Centurion, acting through its employees and agents, worsened Plaintiff's serious medical condition.

Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendant Centurion knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Thus, Defendant Centurion has been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

95.     By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendant Centurion imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

96.     Defendant Centurion's delay and denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

97.     Defendant Centurion's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

98.     Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

99.    The constitutional violations of Defendant Centurion, through the actions and omissions of its employees and agents, were directly and proximately caused by policies, practices, and/or customs implemented and enforced by Defendant Centurion.

100.   As a direct and proximate result of the policies, practices, customs, and deliberate indifference of Defendant Centurion, Plaintiff has suffered damages, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Jeremy White, demands judgment against Defendant Centurion for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT III
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Against Defendant FDC)

101.   Plaintiff incorporates and re-alleges paragraphs 1 through 76 as if fully set forth herein.

102.   This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

103. The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an

affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

104.   Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

105.   Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

106.   Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

107.   Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives them as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).

Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

108.   Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

109.   By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

110.   By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

111.   DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing Plaintiff DAA treatment, Defendant FDC refused or failed to provide

Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

112.   Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

113.   Defendant FDC's refusal to provide Plaintiff with the DAAs also denied Plaintiff access to other prison services, programs, and activities that other inmates routinely access. For example, Plaintiff was unable to participate in recreation and other physical exercise. Further, in the event of a prison fight, because of his physical condition, Plaintiff would be unable to escape quickly. Plaintiff's inability to participate in recreational activities in the prison yard isolates Plaintiff and denies him meaningful access to these prison services, programs, and activities.

114.   Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

115.   DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

116.   Defendant FDC denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

117.   Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to (a) FDC's refusal to provide Plaintiff with the only medical treatment available under the prevailing standard care, (b) FDC's refusal to provide Plaintiff with DAA treatment because the cost of such treatment was too expensive, and (c) to the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAAs, FDC's refusal or failure to even request adequate funding from the Florida Legislature.

118.   Had Defendant FDC not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested throughout his incarceration history and up to his release in 2019, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

119.   Defendant FDC owed Plaintiff a non-delegable duty to ensure that his wellbeing would not be compromised as a result of discrimination based on his disability. As such, Defendant FDC is vicariously liable for the actions of any and

all persons or entities Defendant FDC contracted out its medical services to or otherwise designated to care for Plaintiff.

120.   As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, the Plaintiff, Jeremy White, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT IV
## SECTION 504 OF THE REHABILITATION ACT (RA)
### (Against Defendant FDC)

121.   Plaintiff incorporates and re-alleges paragraphs 1 through 76 as if fully set forth herein.

122.   This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

123.   Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

124.   Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

125.   Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

126.   Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

127.   Defendant FDC denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

128.   Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of FDC's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

129.   Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

130.    As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, the Plaintiff, Jeremy White, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA (FBN: 1010637)
john@andrewslaw.com
RYAN J. ANDREWS (FBN: 0104703)
ryan@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

served electronically on this 19th day of July, 2019, to:

| | |
|---|---|
| Albert J. Bowden, III, Esq.<br>Office of the Attorney General<br>PL-01, The Capitol<br>Tallahassee, Florida 32399-1050<br>al.bowden@myfloridalegal.com<br>Donna.Cushard@myfloridalegal.com<br>*Counsel for Defendant FDC* | R. Craig Mayfield, Esq.<br>Sara D. Accardi, Esq.<br>Bradley Arant Boult Cummings LLP<br>100 North Tampa Street, Suite 2200<br>Tampa, FL 33602<br>cmayfield@bradley.com<br>saccardi@bradley.com<br>adeuter@bradley.com<br>mnewman@bradley.com<br>*Counsel for Defendants Centurion of<br>Florida, LLC and Angel Cortes* |

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA